# Supreme Court of Texas

═══════════

No. 21-0676

═══════════

Steve Huynh, Individually; Yvonne Huynh, Individually; Huynh
Poultry Farm, LLC d/b/a Steve Thi Huynh Poultry Farm d/b/a
Huynh Poultry Farm; T & N Poultry Farm, LLC; Thinh Bao
Nguyen, Individually; Timmy Huynh Poultry Farm; Timmy
Huynh, Individually; and Sanderson Farms, Inc.,

*Petitioners*,

v.

Frank Blanchard, Angelia Snow, Tanya Berry, Kimberly Riley,
John Miller, Amy Miller, Chad Martinez, Emily Martinez,
Mersini Blanchard, Malakoff Properties, LLC, and Ronny Snow,

*Respondents*

═══════════════

On Petition for Review from the
Court of Appeals for the Twelfth District of Texas

═══════════════

JUSTICE HUDDLE, joined by Chief Justice Hecht and Justice
Bland, and by Justice Young as to Part I, concurring in the judgment.

I agree with the Court's ultimate conclusion that the trial court's
entry of a shutdown injunction was an abuse of discretion. But I
disagree with some of what the Court says along its winding path to that
conclusion. What made this case grant-worthy is that the trial court's
injunction—which effectively shuts down the entire chicken-growing

operation—ignores well-established guardrails concerning the scope of an injunction and grants relief far beyond what the evidence supports, including relief the neighbors never sought. It further disregards the robust regulatory system the Legislature and Texas Commission on Environmental Quality (TCEQ) created to carefully balance the competing interests at play. The very *first* iteration of the injunction was a total shutdown. In short, the order cracked a nut with a sledgehammer.

That error should be the focus of the Court's opinion. I grant that the chickens stink—a lot—and that the growers do not contest that some of their business practices failed to pass the smell test. But the Court meanders, occasionally fighting the jury's resolution of factual disputes and failing to emphasize that what really matters for today's purposes is not the chickens' stench or the growers' transgressions but, rather, the trial court's decision to issue a shutdown injunction of a lawful business as its *very first* attempt to craft an equitable remedy.

## I.    *An* injunction was proper.

From a fifty-thousand-foot view of this case, there is much about which I agree with the Court. The Court correctly rejects the growers' three arguments for why *no* injunction was proper. First, they argue that because the jury found in answer to Question 4 that the nuisance was temporary, the trial court could not issue a permanent injunction. Their position is that a *permanent* injunction is not available to abate a *temporary* nuisance. Second, the growers argue that the jury's finding that there was a temporary nuisance necessarily means there was no imminent harm, which is, of course, a necessary element for injunctive

2

relief. Third, they claim the neighbors could not obtain injunctive relief because they had an adequate alternative remedy at law in the form of damages. The Court correctly rejects all three arguments. But, in explaining why they do not carry the day, the Court sends murky messages. I write separately to underscore the real—and dangerous—problem with the trial court's injunction that the Court unfortunately obscures.

## A. With proper evidentiary support, a permanent injunction can issue to abate a temporary nuisance.

Courts are bound by the jury's factual determinations unless they are unsupported by legally or factually sufficient evidence. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613, 615 (Tex. 2016) (explaining the circumstances in which courts may set aside findings); *see also, e.g.*, *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 774 (Tex. 2003) (emphasizing the principles that "a court may not substitute its judgment for that of the jury" and "the jury is the sole judge of the weight and credibility of testimony"). No party challenges the jury's factual findings as unsupported by sufficient evidence. Therefore, neither the trial court nor this Court could ignore them in determining appropriate injunctive relief. *See, e.g.*, *Livingston v. Livingston*, 537 S.W.3d 578, 589 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("[Defendant] was entitled to have the jury determine ultimate issues of fact, but it was for the trial court, based on those factual determinations, to decide the expediency, necessity, and propriety of the injunctive relief requested by [Plaintiff]." (citing *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979))). Although the trial court is responsible for building the injunction, the jury's factual determinations are the

3

building blocks upon which injunctive relief rests. *Cf. Bostow v. Bank of Am.*, No. 14-04-00256-CV, 2006 WL 89446, at *5 (Tex. App.—Houston [14th Dist.] Jan. 17, 2006, no pet.) ("The jury's findings on issues of fact are binding; however, equitable principles and the appropriate relief to be afforded by equity are only to be applied by the court itself.").

In response to Questions 1 and 3, the jury found each grower negligently and intentionally caused a private nuisance to each neighbor. Question 4 then asked the jury to select between two options relating to the type of injury that was proximately caused by the nuisance: (1) injury "of such a character as to recur repeatedly, continually, and regularly"; or (2) injury "of such a character that any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable." As to each neighbor, the jury selected the second option—it found that (a) there was a nuisance and (b) the nuisance was not one that would recur "repeatedly, continually, and regularly."

Despite this, the Court's opinion appears to suggest—despite disclaimers to the contrary—that the trial court could have disregarded the jury's answer to Question 4.[1] *See ante* at 39 (concluding that,

---

[1] In *Gilbert Wheeler, Inc. v. Enbridge Pipelines (East Texas), L.P.*, we clarified that the ultimate question of temporary or permanent injury to real property is decided by the court as a question of law. 449 S.W.3d 474, 481 (Tex. 2014). However, nowhere in *Gilbert Wheeler* did we say that the court can ignore jury findings that are relevant to this determination. In fact, we said the opposite. *See id.* ("[W]e recognize that questions regarding the facts that underlie the temporary-versus-permanent distinction must be resolved by the jury upon proper request."). If the jury here had instead found that the nuisance was "of such a character as to recur repeatedly, continually, and

4

because "Defendants' operations are indisputably permanent, the Neighbors could have argued for a presumption of permanent interference"). I disagree. First, as the Court concedes, it would be unnecessary for the trial court to relabel the nuisance as permanent rather than temporary to support issuance of a permanent injunction. Second, the Court's suggestion improperly usurps the jury's fact-finding role in this case. The record reflects conflicting evidence on how permanent or temporary the nuisance-level odors were. The jury resolved that conflict and determined the nuisance-level odors were of a character that would only recur "occasional[ly], irregular[ly], [and] intermittent[ly]." We are bound by that factual determination. *See Benoit v. Wilson*, 239 S.W.2d 792, 796 (Tex. 1951) ("The jury, not the court, is the fact finding body. The court is never permitted to substitute its finding and conclusions for that of the jury."). The Court should view the finding deferentially, not with hostility.

While I agree with the growers that the jury found facts that can only support a temporary nuisance, I agree with the Court that this finding does not preclude the trial court from issuing a permanent injunction. This is because a nuisance may be temporary in that the discomfort and annoyance it causes remit at times. But it is nevertheless permanent in that it is not going to cease in the future, even if the future annoyance worsens for periods and then wanes. To analogize, a disease may be permanent even if its symptoms are not ever-present. Its symptoms may worsen at times and then subside, but

---

regularly," the trial court could not conclude that the nuisance was, to the contrary, temporary.

5

the diagnosis remains. The same is true here: the fact that the odors were not constantly present does not foreclose the use of a permanent injunction to abate them because it is known that the odors *would* recur despite the unpredictability of knowing when and to what extent. *See generally Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 272 (Tex. 2004) (describing a temporary nuisance).

With that in mind, it is no wonder that we have repeatedly said the ultimate determination to enjoin conduct that causes a nuisance does not turn on whether the nuisance is labeled temporary or permanent. *See id.* at 284 ("[C]haracterization of a nuisance as temporary or permanent should not depend on whether it can be abated."); *see also Crosstex*, 505 S.W.3d at 610 ("A court 'may decide to abate a nuisance whether it is temporary or permanent, and may choose not to abate either even if that is the only remedy requested.'" (quoting *Schneider*, 147 S.W.3d at 286–87)). Although the court's power to issue injunctive relief is not unbounded (more on that later), the court's ability to permanently enjoin a nuisance does not turn on the nuisance's characterization as temporary or permanent, just as the need for treatment of a disease is not solely reserved for when symptoms are most acute.

### B. The jury's finding of a temporary nuisance did not preclude the trial court's finding of imminent harm.

The growers next argue that *no* injunction should have issued because the jury's finding that the nuisance was temporary precludes a finding of imminent harm. "To be entitled to a permanent injunction, a party must prove (1) a wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law."

*Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 792 (Tex. 2020). But "the question of whether imminent harm exists to warrant injunctive relief is a legal question for the court, not a factual question for the jury." *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 554 (Tex. 1998). Since imminent harm is a legal question, it is not subject to a jury's ultimate determination. *Cf. W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 900 (Tex. 2020) (noting that legal questions are answered by courts subject to the jury's underlying factual findings). I agree with the Court that the trial court did not abuse its discretion by concluding that the nuisance, though not found by the jury to be permanent, created imminent harm warranting a permanent injunction.

### C. The neighbors lack an adequate remedy at law for future damages.

The growers next contend no injunction should have issued because the neighbors have an adequate remedy at law: damages. *See Pike*, 610 S.W.3d at 792. If the only harm suffered by the neighbors was a set of past intrusions for which damages are reasonably calculable, then damages would be an adequate remedy at law. *See, e.g., Bank of Sw. N.A., Brownsville v. Harlingen Nat'l Bank*, 662 S.W.2d 113, 116 (Tex. App.—Corpus Christi–Edinburg 1983, no writ) (finding an adequate remedy at law for damages where the defendant was capable of paying the plaintiff a calculable amount for its past wrongs). Here, however, the neighbors seek to prevent the nuisance from recurring in the future, and the quantum of future damages—if any there might be—is uncertain. *See, e.g., Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 427 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("The potential

7

damage . . . cannot be easily calculated and therefore a legal remedy is inadequate."). Indeed, the whole purpose of an injunction is to avoid future wrongs. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations . . . .").

The growers insist that there is an adequate remedy for these future harms: more litigation. Under this theory, because the jury found that recurrence of the nuisance-level odors would be "not reasonably predictable," the neighbors would have to wait for the nuisance to recur and then rush to court. This "remedy" leaves all parties before us "in a state of perpetual litigation," and, as we noted in the past, while "'good fences make good neighbors,' repeated litigation is unlikely to." *Schneider*, 147 S.W.3d at 278 (footnote omitted) (quoting ROBERT FROST, *Mending Wall*, *in* NORTH OF BOSTON (1914)). Ultimately, if a remedy at law "will lead to a multiplicity of suits, 'that very fact prevents it from being complete and adequate.'" *Campbell v. Wilder*, 487 S.W.3d 146, 152 (Tex. 2016) (quoting *Repka v. Am. Nat. Ins. Co.*, 186 S.W.2d 977, 980 (Tex. 1945)).

## II. The *shutdown* injunction exceeded the proper limits on the scope of injunctions.

I concur with the Court's judgment that the trial court's injunction was too broad and must be narrowed on remand. But the Court goes astray, in my view, by (1) discussing irrelevant evidence under the guise of balancing equities to determine the scope of an appropriate injunction; and (2) failing to clearly direct the trial court to craft an injunction that accords with the Legislature's policy choices for

8

remedying nuisance-level chicken farm odors, as reflected in the Texas Health and Safety Code and TCEQ regulations.

### A. A total shutdown of a lawful business should be a last resort, not a first.

Injunctions are exceedingly powerful tools. They are not an option of first resort, but an option of last resort once the court is satisfied there are no adequate legal remedies. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 210 (Tex. 2002) ("The general rule at equity is that before injunctive relief can be obtained, it must appear that there does not exist an adequate remedy at law." (quoting *Republic Ins. Co. v. O'Donnell Motor Co.*, 289 S.W. 1064, 1066 (Tex. App.—Dallas 1926, no writ))). So trial courts issuing injunctions—particularly permanent ones—must craft them as narrowly as possible. *Holubec v. Brandenberger*, 111 S.W.3d 32, 40 (Tex. 2003) ("[I]njunctions must be narrowly drawn and precise." (quoting *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992))).

In my view, the Court's analysis strays from a proper balancing of the equities in two important respects. First, the Court details the growers' sins regardless of whether they caused or contributed to the nuisance. A court charged with balancing equities should balance them with a nose to abating the nuisance above all else. *See, e.g.*, *Hot Rod Hill Motor Park v. Triolo*, 276 S.W.3d 565, 568–72 (Tex. App.—Waco 2008, no pet.) (engaging in factual analysis to balance the equities with a focus towards considerations relating to the nuisance in question); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (Roberts, C.J., concurring) ("Discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle

of justice that like cases should be decided alike." (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005))). Whether the growers unjustly obtained federal subsidies, for example, is irrelevant *except to the extent that it causes or contributes to the nuisance*. This is because injunctions must not operate as punishments, but as correctives. *See Hyde Corp. v. Huffines*, 314 S.W.2d 763, 780 (Tex. 1958).

The Court's focus on the growers' bad acts distracts from the simple black-letter principle that the order sidestepped: "an injunction must be narrowly tailored to address the offending conduct—it must not be so broad that it would enjoin a defendant from acting within its lawful rights." *TMRJ Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 212 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see also Fairfield Ests. L.P. v. Griffin*, 986 S.W.2d 719, 723 (Tex. App.—Eastland 1999, no pet.) (explaining that an overly broad injunction granting more relief than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or exercising legal rights is an abuse of discretion).

Given these well-established limits on injunctive relief, it will almost never be appropriate for a trial court to issue a shutdown order whose scope necessarily enjoins unlawful *and lawful* activity as its very first remedy. There is nothing innately improper about operating a chicken farm. In our industrialized society, some odors from a variety of industries are unavoidable. *See Sherman Gas & Elec. Co. v. Belden*, 123 S.W. 119, 120 (Tex. 1909) (noting that the lawful and ordinary use of new businesses may sometimes have the effect of changing values of nearby property). Thus, the trial court's task is to craft an injunction

10

that halts the activity that raises the odors to an unlawful level but permits activity that does not.

"A 'nuisance' is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Crosstex*, 505 S.W.3d at 593 (quoting *Holubec*, 111 S.W.3d at 37). Our definition of nuisance reflects an "effort[] to incorporate the requirement that the hurt and inconvenience be 'substantial' and 'unreasonably' annoying or discomforting to a person of 'ordinary sensibilities.'" *Id.* Therefore, in abating the nuisance, the trial court should craft an injunction that is the least restrictive way to reduce the nuisance-level odors to levels that a person of ordinary sensibilities would not regard as unreasonably annoying. The goal, emphatically, is not to eliminate all unpleasant odors entirely. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established . . . ."). So the "injunction must be specific in its terms to be enforceable, describing in clear and precise detail the acts sought to be restrained." *Wiese v. Heathlake Cmty. Ass'n*, 384 S.W.3d 395, 399 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Injunctions "should be broad enough to prevent subsequent violations of those already committed, but not so broad as to enjoin a defendant from activities that are a lawful and proper exercise of his rights." *Id.*; *see also Holubec v. Brandenburger*, 214 S.W.3d 650, 657 (Tex. App.—Austin 2006, no pet.) ("[A]n injunction will be granted only to restrain actually existing nuisances, and not to restrain an intended act on the ground that it may become a nuisance.").

**B. The injunction must align with existing Texas law governing acceptable poultry-farm odor levels.**

As noted above, well-established law provides that an injunction must be narrowly tailored to abate a nuisance but without enjoining lawful conduct. Thus, to determine the appropriate scope of an injunction in a case like this, a trial court must determine the point at which odor emission goes from lawful to unlawful—and then craft its injunction to prohibit only the latter. This may seem a daunting task in this case, for few law-school courses address chicken-farm odor management. Thankfully, Congress and the Texas Legislature have created a comprehensive scheme to balance competing interests on this precise issue. The trial court in this case seemingly disregarded it but, on remand, it must ascertain the line between lawful and unlawful odor emissions and craft an injunction that dovetails with that legislative determination.

Under federal law, states are required to regulate their air quality. *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 64 (1975). How the states choose to do so, however, is up to them. *See id.* In Texas, the Legislature passed the Texas Clean Air Act in 1967. *See BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 5 (Tex. 2016); TEX. HEALTH & SAFETY CODE §§ 382.001–.551. The Act created the TCEQ and empowers that agency to administer and enforce the Act's provisions. *BCCA*, 496 S.W.3d at 5; *see also Brazoria County v. Tex. Comm'n on Env't Quality*, 128 S.W.3d 728, 733 (Tex. App.—Austin 2004, no pet.) ("In Texas, [the] TCEQ is the state agency generally charged with protection of air quality within the state."). Pursuant to this legislative scheme, the TCEQ acts to prevent or abate nuisances related

12

to air quality. *Cf., e.g., Slay v. Tex. Comm'n on Env't Quality*, 351 S.W.3d 532, 534–37 (Tex. App.—Austin 2011, pet. denied) (providing an example of TCEQ enforcement actions). In essence, Texas law specifies the degree of odor a chicken farm lawfully may emit, and, rather than enjoin the growers' operations entirely, the trial court should have consulted the legislative and regulatory scheme and crafted its injunction to align with it. The trial court erred by failing to do so.

In crafting an injunction, Section 382.068 of the Health and Safety Code, aptly titled "Poultry Facility Odor; Response to Complaints," provides important, detailed guidance. It reflects a system in which the TCEQ responds to complaints about poultry odors and, upon finding an air-quality violation, issues a notice of violation (NOV). *See* TEX. HEALTH & SAFETY CODE § 382.068(b), (c). If problems persist and the TCEQ issues three NOVs in one year, then a "comprehensive compliance agreement" is entered between the violator and the TCEQ. *Id.* § 382.068(d). This agreement "must include an odor control plan that the executive director determines is sufficient to control odors." *Id.*

As the Court discusses, the TCEQ was aware of the problem in this case and issued several NOVs.[2] In accordance with the Health and Safety Code, the growers and the TCEQ agreed to a Strategic Odor Control Plan. The neighbors assert that the growers did not adequately implement it and that the TCEQ did not adequately enforce it. But that is no evidence that the Plan itself was insufficient to abate the nuisance-level odors so as to achieve compliance with Texas law, had it

---

[2] In fact, six weeks before the beginning of trial, the TCEQ had issued two NOVs.

13

been implemented properly. The trial court, of course, does not dictate the TCEQ's response to violations. But it should not, out of frustration with the TCEQ's perceived lack of interest, ignore the TCEQ's detailed regulatory system and determination about what conduct would be sufficient to achieve compliance. It must grapple with the factors the TCEQ regulates—number of chickens, frequency of cycles, proper ventilation, maintenance of facilities, etc.—to ascertain the extent to which the growers can both grow chickens and comply with the law and then craft its injunction to permit that level of activity.

The Strategic Odor Control Plan presumably does this and could serve as a guide for crafting a proper injunction.[3] This is not to say that the trial court must regurgitate the Plan in its injunction, but neither may it ignore the TCEQ entirely. Though this exercise may be tedious, aligning the injunction with TCEQ regulations is necessary to ensure that injunctions respect rather than reject the Legislature's determination of the extent to which the growers must scale back their operations to reduce nuisance-level odors *without* going so far as to prohibit the growers' lawful conduct. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 476 F. Supp. 2d 275, 284 (S.D.N.Y. 2007) ("[A]ny injunctive or equitable relief which might eventually issue from

---

[3] The Court, confusingly, suggests there was no Plan that if properly implemented could control the odors, *see, e.g.*, *ante* at 20–21, despite testimony in the record to the contrary. The Court incorrectly frames testimony from a TCEQ official that the Plan was turned in late and that a separate self-audit was insufficiently detailed to conclude the Plan itself is not worth considering in an injunction order. *See, e.g.*, *ante* at 20–21, 49 n.50, 70.

this Court will surely take into account the need for consistency and coordination with the actions of the involved state agencies.").

None of this is to say that a permanent injunction shutting down a chicken farm would never be appropriate. It might be in the face of continued, willful violations of an existing, narrower injunction. *Cf. Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 937 S.W.2d 60, 79 (Tex. App.—Houston [14th Dist.] 1996) ("The Court considered the fact that an earlier, more narrow injunction failed to accomplish its purpose . . . ."), *aff'd as modified*, 975 S.W.2d 546 (Tex. 1998). But a trial court should not, as its very first attempt to abate a nuisance, issue an injunction that permanently prohibits lawful business activity. This is doubly true when there exists a regulatory scheme that is intended to address and ameliorate the very nuisance-level odors the trial court seeks to abate. As courts we give effect to laws and regulations; we must not create our own.

\* \* \*

The trial court abused its discretion in entering an injunction that prohibits lawful conduct along with unlawful conduct. I therefore concur in the Court's judgment reversing and remanding for the trial court to modify the scope of its injunction. On remand, it must consider existing Texas law, as set forth in the Texas Health and Safety Code and TCEQ regulations, to craft a narrower injunction that accords with the Legislature's careful determination of the balance between the growers' interest in running a lawful business and the neighbors' interest in enjoying their property.

15

_____
Rebeca A. Huddle
Justice

**OPINION FILED:** June 7, 2024